1998 OK CR 66

**Eric Allen PATTON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–96–1460.

Court of Criminal Appeals of Oklahoma.

Dec. 9, 1998.

Rehearing Denied March 17, 1999.

Barry Albert, Catherine Hammarsten, Oklahoma County Public Defender's Office, Okla. City, for Appellant at trial.

Robert Macy, District Attorney, Sandra Elliott, Pattye High, Assistant District Attorneys, Okla. City, for the State at trial.

Wendell B. Sutton, Oklahoma County Public Defenders Office, Okla. City, for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, William L. Humes, Assistant Attorney General, Okla. City, for the State on appeal.

### *OPINION*

LUMPKIN, Judge.

¶ 1 Appellant Eric Allen Patton was tried by jury and convicted of First Degree Murder (Count I) (21 O.S.1991, § 701.7) and First Degree Burglary, After Former Conviction of Two or More Felonies (Count II) (21 O.S.1991, §§ 1431 & 51), Case No. CF–95–55, in the District Court of Oklahoma County. In Count I, the jury found the existence of four (4) aggravating circumstances and recommended the punishment of death. In Count II, the jury recommended as punishment one thousand one hundred and twenty (1,120) years imprisonment. The trial court sentenced accordingly. From this judgment and sentence Appellant has perfected this appeal.[1]

¶ 2 On December 16, 1994, Appellant was employed as a brick mason. During the morning, Appellant left the job site in Edmond, Oklahoma, ostensibly to purchase electrical connection boxes at a local hardware store. Appellant drove co-worker Chris Williams' car and was gone four hours.

---

1. Appellant's Petition in Error was filed in this Court on May 19, 1997. Appellant's brief was filed November 26, 1997. The State's brief was filed March 11, 1998. The case was submitted to the Court March 13, 1998. Appellant's reply brief was filed March 31, 1998. Oral argument was held July 28, 1998.

When he returned, he did not have the electrical boxes and was wearing clothes belonging to his co-worker Chris Williams, clothes different than he had worn earlier in the day.

¶ 3 During the time Appellant was gone, he went to the home of Les and Charlene Kauer in northeast Oklahoma City. Charlene Kauer answered Appellant's knock at the front door. He asked to borrow money. Mrs. Kauer gave him ten dollars ($10.00). Not satisfied, Appellant forced his way into the home, grabbed Mrs. Kauer by the throat and dragged her through the house looking for money and valuables. He took her to the bedroom where he forced her to undress and then struggled with her. He stabbed her numerous times, then dragged her down the hallway into the kitchen. The struggle between Appellant and Mrs. Kauer continued and he stabbed her several more times with a variety of knives. As the fierceness of the attack broke a succession of knives, Appellant resorted to a barbecue fork. Unsure if the severely wounded Mrs. Kauer was dead, he plunged a pair of scissors into her chest. Appellant left the scene, cleaned up and traded his bloody clothes for a pair of coveralls found in Williams' car. The bloody clothes were dropped in a field in northwest Oklahoma City and Appellant returned to his job in Edmond.

¶ 4 Appellant initially was not a suspect in the victim's murder, but at the request of the police, he came to their office for questioning, as he had previously done some painting work for the Kauers and worked with them at Dial American Marketing. Through a series of interviews, Appellant gave body samples and answered questions. He was eventually arrested when fingerprint comparison revealed his prints at the murder scene. During this series of interviews, Appellant initially denied any involvement in the murder. He then stated that he had seen a suspicious vehicle at the victim's residence and suggested Mr. Kauer was involved in the murder. When asked about a scratch on his lip and cuts on his hands he explained that he was changing a tire and the jack slipped and hit him.

¶ 5 During a subsequent interview, Appellant inculpated his co-worker Chris Williams in the murder. He told police he had a lot of information to give them, but he was protecting someone. He said he was guilty just because he was at the Kauer's home but that the other person committed the murder. Appellant went on to say that Mrs. Kauer was not supposed to be home that day, that he had gone over to steal some items from the house and discovered her there by accident. He said the other person assaulted Mrs. Kauer and tore her clothes off. Afraid Mrs. Kauer was going to be raped, Appellant intervened. That was when he was cut on the hand and scratched on the lip. He added that they "had only gotten a lousy $14.00 and the woman didn't even put up a fight." Appellant took the officers to a field in northwest Oklahoma City where he had disposed of his bloody clothes and showed the officers several convenience stores which he admitted robbing.

¶ 6 In another interview, Appellant admitted that Chris Williams was not involved in the murder but there had been a woman with him at the victim's home. This woman, called a "strawberry"[2] by Appellant, took part in the murder. Appellant said the woman stabbed the victim while he wrestled with the victim's dog, eventually stabbing the dog. He said the cuts on his hand and the scratch on his lip came from the victim's dog which bit him. At the end of the interview, Appellant admitted there had been no "strawberry" with him. When asked who the woman with him was, Appellant only indicated she was a family member.

¶ 7 In a subsequent interview Appellant admitted seeing himself at the murder and stabbing the victim, but said there were demonic forces present and the victim was a demon. Appellant also said that he had ingested cocaine before the murder and believed the drug was "laced" with another drug. He said he was "tripping" from the effects of the drugs. Appellant described in detail his activities immediately before the murder, during the murder and afterwards.

2. A "strawberry" was defined in the record as a woman who exchanged sex for drugs.

## JURY SELECTION

### A.

¶ 8 In his first assignment of error, Appellant contends the trial court erred in restricting the scope of voir dire and that such restriction violated the Oklahoma and Federal constitutions. Specifically, he argues the trial court erred in prohibiting questions to prospective jurors regarding: 1) whether they believed a person given the death penalty would actually be executed and what kinds of factors would be important in determining whether the death penalty was an appropriate sentence; 2) whether meaningful consideration would be given to lesser included offenses; and 3) whether meaningful consideration would be given to psychiatric testimony.

¶ 9 The purpose of voir dire examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. *Mayes v. State,* 887 P.2d 1288, 1298 (Okl.Cr.1994); *Duvall v. State,* 825 P.2d 621, 631 (Okl.Cr.1991), *cert. denied,* 506 U.S. 878, 113 S.Ct. 224, 121 L.Ed.2d 161 (1992). The manner and extent of voir dire is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. *Duvall,* 825 P.2d at 631. The trial court may properly restrict questions that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury. *Nauni v. State,* 670 P.2d 126, 130 (Okl.Cr. 1983). There is no abuse of this discretion so long as the voir dire questioning is broad enough to afford the Appellant a jury free of outside influence, bias or personal interest. *Duvall,* 825 P.2d at 631.

¶ 10 This Court has previously found no error in the trial court's restriction of questioning concerning the possibilities of the death sentence being actually carried out. *Id.,* 825 P.2d at 631. In *Duvall,* we held it was not relevant or proper to inquire as to whether or not a juror actually believes the penalty recommended will or will not be imposed. *Id.* We similarly find that such a question is not relevant in the present case. The answer to such a question would not be determinative of whether a person could discharge his or her duties as a juror. "Given the traditionally broad discretion accorded to the trial judge in conducting voir dire, and our inability to discern any possible prejudice from not allowing that particular question on voir dire, we do not find that the Appellant's constitutional rights were violated when the trial judge refused this question." *Id.,* at 632.

¶ 11 This Court has also upheld a trial court's ruling prohibiting the questioning of potential jurors as to circumstances they would consider to be mitigating. *McCarty v. State,* 904 P.2d 110, 115 (Okl.Cr. 1995); *Fox v. State,* 779 P.2d 562, 569 (Okl. Cr.1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). In *Sellers v. State,* 809 P.2d 676, 682–683 (Okl.Cr.), *cert. denied,* 502 U.S. 912, 112 S.Ct. 310, 116 L.Ed.2d 252 (1991), we found no error in the trial court's prohibition of inquiries into youth as a mitigating factor. We stated:

While it is proper to inquire whether a prospective juror is willing to consider the alternate punishments prescribed for First Degree Murder, we find no abuse of discretion in refusing to permit inquiry into views on particular mitigating circumstances. To permit such questioning would make voir dire an open forum for discussion of any circumstances accompanying the murder, both mitigating and aggravating. The great potential to improperly influence the jury weighs strongly in support of the trial court's ruling in this case.

While a criminal defendant in a State court is guaranteed an impartial jury by the Sixth Amendment, (cite omitted) ... the Constitution does not always entitle a defendant to propound questions during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. (cite omitted) ... [t]he State in this case was able to fulfill its obligation to impanel an impartial jury with less than a specific inquiry into appellant's area of concern, and this argument must fail.

*See also Bryson v. State,* 876 P.2d 240, 253 (Okl.Cr.1994); *cert. denied,* 513 U.S. 1090,

115 S.Ct. 752, 130 L.Ed.2d 651 (1995). In the present case, the trial court properly limited Appellant's open ended inquiries to potential jurors as to what kinds of factors would be important in determining whether the death penalty was an appropriate sentence.

¶ 12 Appellant also complains the trial court restricted his ability to discern through questioning whether the prospective jurors would give meaningful consideration to lesser included offenses. In *Allen v. State*, 871 P.2d 79, 90 (Okl.Cr.), *cert. denied*, 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994) the appellant similarly complained that the trial court refused to allow counsel to inquire as to lesser included offenses. We found no error in the trial court's refusal as every juror who was asked indicated he or she could follow the applicable law given to them by the trial court. "This indicates to us each juror indicated he or she could consider a lesser included instruction. We find no abuse of discretion in the court's refusal to allow counsel's question about lesser included offenses." *Id.* Further, the record reflects that defense counsel understood that questions concerning whether jurors would follow the law and the instructions given to them were proper, but that questions concerning lesser included instructions were improper during voir dire. Therefore, we find no error in the trial court's restriction of questioning into lesser included offenses.

¶ 13 Finally, Appellant complains the trial court improperly restricted questioning into whether meaningful consideration would be given to psychiatric testimony, and specifically whether prospective juror Pierce could consider such evidence. The trial court found questioning Mr. Pierce in this area was redundant as he had said he could give the same consideration to everyone that testified. The record of Mr. Pierce's voir dire, and that of other veniremen, supports the trial court's ruling. Each prospective juror was thoroughly examined as to whether they would fully consider all of the evidence presented by both the State and the defense during trial. Mr. Pierce's responses indicated he understood that the testimony of both expert witnesses and lay witnesses was to be given the same initial consideration, that he and the other jurors were the judges of the credibility of the witnesses, and that despite certain personal experiences, he could keep an open mind and consider all the evidence. Any further inquiry into the specific area of psychiatric testimony would have been redundant and repetitive.

¶ 14 Appellant further argues that his concerns into the consideration to be given the psychiatric testimony by the jury were justified by the antics of Juror Fisher. Appellant directs us to the conclusion of the defense's case-in-chief and Appellant's move to remove Juror Fisher as he "laughed, giggled and rolled his eyes" during the testimony of the psychiatric witness. The trial court overruled Appellant's motion finding the juror's conduct showed only boredom at the repetitious nature of the testimony and not an inability to seriously consider the testimony. Having fully reviewed the voir dire in this case, we find defense counsel were only restricted when their questioning became repetitive, irrelevant or regarded legal issues upon which the trial court would instruct the jury. The trial court allowed an extensive and lengthy voir dire examination. The Constitution does not always entitle a defendant to have questions posed during voir dire specifically directed to matters that might prejudice jurors against him. *Duvall*, 825 P.2d at 632. Appellant's constitutional rights were not violated when the trial court restricted the questioning on voir dire as an impartial jury was seated without the specific inquiries sought by Appellant. Accordingly, this assignment of error is denied.

**B.**

¶ 15 In his second assignment of error, Appellant contends the trial court erred in removing for cause prospective jurors Goeke, Sailer, Reynolds, Storey and Adams before it was adequately established such prospective jurors could not follow the law.

¶ 16 The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the

juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). A juror's bias need not be proved with "unmistakable clarity;" neither must the juror express an intention to vote against the death penalty "automatically." *Id. See also Bryson,* 876 P.2d at 252–53. Determination of a juror's bias often cannot be reduced to a question and answer session. *Id. Despite the lack of clarity in the written record, there are situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.* Id. *This Court will look to the entirety of the juror's voir dire examination to determine if the trial court properly excused the juror for cause.* Castro v. State, *844 P.2d 159, 166 (Okl.Cr. 1992);* Davis v. State, *665 P.2d 1186, 1194 (Okl.Cr.1983),* cert. denied, *464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983). As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion.* Bryson, *876 P.2d at 253.*

¶ 17 With these principles in mind, we turn to the record in this case. prospective juror Goeke stated that she would give meaningful and thoughtful consideration to all three of the possible punishments; however, she did not think the death penalty was a good idea. She said she could not envision a situation where the evidence and the law would be such that the death sentence could be an appropriate sentence. Upon further questioning by the State, Ms. Goeke indicated she understood the State was entitled to jurors who would be fair and follow the law, and that included jurors able to consider each of the three possible punishments. However, when asked a second time if she could foresee circumstances where she could raise her hand and vote for the death penalty, she answered in the negative. The State then asked to have Ms. Goeke excused for cause, to which the defense objected. The trial court overruled the objection and excused Ms. Goeke for cause.

¶ 18 Prospective juror Sailer said she could not give meaningful consideration to the death penalty as a possible punishment and there were no set of circumstances or facts under which she could vote for the death penalty. On the State's motion and over defense objection, Ms. Sailer was excused for cause. Likewise, prospective juror Reynolds, after being informed of the three possible punishments, stated she could not give meaningful and thoughtful consideration to the death penalty. She also stated she could not envision any set of circumstances or facts in which she could vote for the death penalty. On the State's motion, and over defense objection, Ms. Reynolds was excused for cause. Each member of the jury must be willing to consider all the penalties provided by law and not be irrevocably committed before the trial has begun. *Neill v. State,* 896 P.2d 537, 549 (Okl.Cr.1994), *cert. denied,* 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740, (1996); *Duvall,* 825 P.2d at 630. The unequivocal responses of the above prospective jurors establish that they could not consider the death penalty under any circumstances. Because these prospective jurors could not consider all of the punishments provided by law, they could not discharge their duties as jurors. Accordingly, we find no error in their removal for cause.

¶ 19 Prospective juror Storey stated that she did not believe in the death penalty. When asked if there were any set of circumstances under which she could impose the death sentence, she replied "not really." When asked again if there any circumstances under which she could consider the death sentence, she replied "no." The trial court removed Ms. Storey for cause. Prospective Juror Adams stated that he was a minister and that he could not consider the death penalty. When asked if there were any set of circumstances under which he could impose the death sentence, he responded in the negative. The trial court excused him for cause. No objections were raised by the defense to the excusal of these two veniremen. Therefore, we review only for plain error.

¶ 20 We do not find any plain error in this case as both prospective jurors unequiv-

ocally stated they could not consider the death sentence as a possible punishment. Appellant asserts that the questioning of all five prospective jurors was insufficient to allow a proper determination of their ability to serve as jurors. While some of the questioning may have been brief, it was sufficient to establish that the prospective jurors views about capital punishment would have prevented or substantially impaired their duties as jurors in accordance with the instructions and their oath. *Romano v. State*, 847 P.2d 368, 377 (Okl.Cr.1993). Accordingly, we find no error in their dismissal for cause.

¶ 21 Appellant argues counsel was ineffective for failing to object to the excusal of veniremen Storey and Adams. As any objections would have been properly overruled, we cannot find counsel was ineffective for failing to object. *See McKinnon v. State*, 752 P.2d 833, 835 (Okl.Cr.1988). Accordingly, this assignment of error is denied.

### C.

■ ¶ 22 In this third assignment of error, Appellant contends the trial court erred in failing to excuse for cause prospective jurors Weaver and Rodriguez. Both veniremen were ultimately removed through the exercise of Appellant's peremptory challenges. This claim has been properly preserved for appellate review as Appellant objected to the trial court's failure to excuse the jurors, exhausted all peremptory challenges, requested two additional peremptory challenges and identified on the record two additional veniremen who would have been excused had defense counsel not used the peremptory challenges on Weaver and Rodriguez. *Mitchell v. State*, 884 P.2d 1186, 1195 (Okl.Cr.1994); *cert. denied*, 516 U.S. 827, 116 S.Ct. 95, 133 L.Ed.2d 50 (1995); *Woodruff v. State*, 846 P.2d 1124, 1131 (Okl.Cr.1993), *cert. denied*, 510 U.S. 934, 114 S.Ct. 349, 126 L.Ed.2d 313 (1993).

■ ¶ 23 The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion. *Allen v. State*, 862 P.2d 487, 491 (Okl.Cr.1993), *cert. denied*, 511 U.S. 1075, 114 S.Ct. 1657, 128 L.Ed.2d 375 (1994). The trial court's decision will not be overturned unless an abuse of discretion is shown. *Id.* We find none in this case.

■ ¶ 24 During voir dire, Mr. Weaver expressed concern for the safety of his family because he had given his address in open court. Appellant argues the trial judge abused his discretion in failing to excuse Mr. Weaver as the venireman emphatically stated that he could not be fair to both sides and could not fairly listen to the evidence. The record reflects that Mr. Weaver did initially express concern for the safety of his family and for that reason, he could not sit and listen fairly to the evidence. Upon further questioning by the State, he indicated he could be fair but he felt uneasy about the whole process. Denying Appellant's motion to excuse Mr. Weaver for cause, the trial court permitted counsel to question Mr. Weaver further concerning his ability to consider all three punishment options. During this extensive inquiry by both counsel for the State and the defense, it is clear Mr. Weaver was able to fairly listen to all the evidence and consider all punishment options. At the end of this additional questioning, Appellant did not renew his motion to excuse Mr. Weaver for cause. When Mr. Weaver's voir dire is read in its entirety, it is clear that, notwithstanding his concerns for his family's safety, he was able to fully and fairly listen to all of the evidence and consider all punishments, thereby fulfilling his duty as a juror. We find no error in the trial court's refusal to excuse Mr. Weaver for cause.

■ ¶ 25 Appellant argues the trial court erred in failing to excuse prospective juror Rodriguez for cause due to "implied bias arising out of the State's representation that Appellant [has] robbed a 7–Eleven where Rodriguez was employed or due to a misrepresentation of facts by the prosecutor, who never presented evidence of a 7–Eleven robbery during the second stage, thereby inducing trial counsel to expend a peremptory challenge resulting in an unconstitutional denial of a substantial statutory right." (Appellant's brief, pg. 20–21). Appellant's allegations are not borne out by the record.

¶ 26 Mr. Rodriguez was initially passed for cause by the defense. The prosecutor

then stated on the record that she had previously informed defense counsel that it appeared that Mr. Rodriguez worked at one of the 7–Eleven stores which Appellant had robbed and which would be the subject of second stage proceedings. The prosecutor stated that Appellant had pointed out to police several stores and service stations which he had robbed. One of those was the store where Mr. Rodriguez worked although he was not the clerk on duty at the time of the robbery. Defense counsel said they were aware of the information and for that reason, moved to remove Mr. Rodriguez for cause. The trial court overruled the motion, stating the information had been known at the time Mr. Rodriguez was examined as to punishment issues and no attempt had been made to question him about a robbery at his store. After an attempt by counsel and the court to determine the exact location of the store where Mr. Rodriguez worked and whether it was actually one of those identified by Appellant, the trial court allowed counsel to ask Mr. Rodriguez a few more questions. During inquiry by defense counsel it was established that Mr. Rodriguez had not been the victim of a robbery at his store nor could he remember ever hearing of a robbery at his store. Mr. Rodriguez also stated that he had never seen nor was he in any way familiar with Appellant. At the conclusion of this inquiry, Appellant did not renew his motion to exclude Mr. Rodriguez for cause. A review of this record shows Mr. Rodriguez was able to fairly consider all the evidence and all possible punishments. Therefore, there was no reason to excuse him for cause.

¶ 27 Finally, Appellant argues the record supports a finding that one or more of the twelve jurors who ultimately served were not impartial. In support of this claim, he directs us to Juror Fisher's consideration of Dr. Smith's psychiatric testimony and counsel's inability to voir dire the prospective jurors on their consideration of psychiatric testimony. Appellant's specific allegations have been previously addressed and rejected. In response to Appellant's general argument about the lack of an impartial jury, we refer to *Woodruff v. State,* 846 P.2d at 1132 wherein we stated:

The jury trial system is founded on the impartiality of a body of peers selected by counsel. Voir dire is the procedure designed to give a criminal defendant the opportunity to explore the opinions and personal knowledge of potential jurors who may ultimately decide his fate. One of the purposes of voir dire is to ensure a criminal defendant's right to a fair and impartial jury. The critical fact to be determined is whether the defendant received a fair trial from jurors who could lay aside any personal opinions and base a verdict on the evidence.

In the present case, the trial court conducted an exhaustive voir dire. Those prospective jurors with preconceived opinions for or against Appellant, who could not set aside those opinions or who had doubts about their ability to be impartial, were excused. The remaining prospective jurors were questioned further as to their knowledge of persons involved in the case. Counsel for the State and for both defendants carefully questioned each prospective juror to make certain that each could and would set aside any emotion he or she might have concerning this case and depend solely on the evidence presented during trial to decide the outcome. As a result, we find that the defendants were left with twelve impartial jurors.

¶ 28 In the present case, a very thorough and exhaustive voir dire was conducted. Only those individuals who could set aside preconceived opinions and fully and fairly consider all of the evidence presented during the trial and all of the punishments provided by law were seated as jurors. Accordingly, this assignment of error is denied.

### D.

¶ 29 In Appellant's fourth assignment of error he raises a final challenge to jury selection. He contends the prosecutor improperly used two peremptory challenges to remove minority jurors from the panel and that the removal was motivated by racial considerations in violation of *Batson v. Kentucky,* 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 (1986).

¶ 30 Batson establishes a three (3) part analysis: 1) the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; 2) after the requisite showing has been made, the burden shifts to the prosecutor to articulate a race neutral explanation related to the case for striking the juror in question; and 3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* The Court noted the race neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. *Neill*, 896 P.2d at 546, quoting *Batson*, 476 U.S. at 98, n. 20, 106 S.Ct. at 1723, n. 20. The trial court's findings as to discriminatory intent are entitled to great deference. *Id.* Therefore, we review the record in the light most favorable to the trial court's ruling. *Id.*

¶ 31 Assuming arguendo Appellant made a prima facie showing, the prosecutor offered race neutral explanations for striking from the panel Mr. Pugh. The prosecutor stated that Mr. Pugh had a very "cavalier" attitude in regards to punishment, that he did not appear to understand many of the questions that were asked because his answers were not consistent with the questions, that he appeared to have a hostile attitude towards law enforcement, and he was the same age as Appellant. We believe these reasons are sufficiently neutral to pass constitutional muster. *See United States v. McMillon*, 14 F.3d 948, 953 (4th Cir.1994)(no racial motivation found behind strike of juror who was the same age as defendant); *Neill*, 896 P.2d at 546–547 (hostile attitude toward law enforcement or State and lack of appreciation for the serious nature of the task to be performed by a juror deciding whether the death penalty should be imposed constitute sufficient race neutral explanation for strike of juror).

¶ 32 Mr. Cole was removed from the jury, not by the State's use of a peremptory challenge, but by the trial court. The prosecutor repeatedly voiced concerns over Mr. Cole's ability to carry out his duties as juror after observing his propensity to sleep during portions of voir dire and trial. During the State's case-in-chief, the prosecutor stated for the record that she had observed Mr. Cole sleep through the testimony of the technical investigator and "almost the entire afternoon". Concerned that Mr. Cole was not able to hear all the evidence, the State moved to have Mr. Cole dismissed for cause. The trial court indicated that he and his clerk had noticed Mr. Cole sleeping and the court had called Mr. Cole to the bench. Mr. Cole admitted that due to his job working nights, he was having trouble staying awake during the trial. Appellant objected to Mr. Cole's removal for cause stating that he believed it was an attempt by the State to have a minority member removed from the panel. After questioning Mr. Cole in chambers, an agreement was reached that the jurors on either side were to elbow Mr. Cole if he fell asleep again, but if he continued to have problems staying awake, the court would need to do something. At the beginning of court six days later, Mr. Cole did not appear. The judge noted Mr. Cole's absence and that Mr. Cole had been late for court once the prior week. The court stated that a call had been placed to Mr. Cole's home and information obtained from his wife that Mr. Cole was ill and must have forgotten to call the court. The court denied Appellant's motion to delay the trial until Mr. Cole returned, finding Mr. Cole a problem juror who could no longer be overlooked. Mr. Cole was removed from the jury and replaced with the first alternate.

¶ 33 Based upon this record, the removal of Mr. Cole is not subject to a *Batson* analysis. The removal of Mr. Cole did not occur during jury selection, and did not involve the use of a peremptory challenge in a racially motivated manner by the prosecution. The action to remove the juror was taken by the court and was not racially motivated in any manner. In light of Mr. Cole's propensity to sleep during trial and his general inability to appreciate the seriousness of the proceedings the trial court properly removed him from the panel. As Appellant has failed to show the removal of these two minority members was premised on racial considerations, this assignment of error is denied.

## FIRST STAGE ISSUES

### A.

¶ 34 In his sixth assignment of error, Appellant challenges the sufficiency of the evidence supporting the conviction for first degree malice aforethought murder. Appellant argues that the evidence at trial showed that he was so intoxicated and in a state of delirium from cocaine at the time of the homicide as to be incapable of forming a specific intent to kill, thus negating the essential element of malice aforethought.

¶ 35 When the sufficiency of the evidence is challenged on appeal, this Court reviews the evidence under the standard set forth in *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr.1985), whether after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the essential elements of the crime beyond a reasonable doubt. This Court will accept all reasonable inferences and credibility choices that tend to support the verdict. *Washington v. State*, 729 P.2d 509, 510 (Okl.Cr.1986).

¶ 36 "A design to effect death [i.e., premeditation] is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed." 21 O.S.1991, § 702. Premeditation sufficient to constitute murder may be formed in an instant. *Boyd v. State*, 839 P.2d 1363, 1367 (Okl.Cr.1992). Malice aforethought may be proved by circumstantial evidence. *Cavazos v. State*, 779 P.2d 987, 989 (Okl.Cr. 1989).

¶ 37 Voluntary intoxication is not a defense to criminal culpability. 21 O.S.1991, § 153. However, we recognize an exception to this rule where the accused was so intoxicated that his mental abilities were totally overcome and it therefore became impossible for him to form criminal intent. *Crawford v. State*, 840 P.2d 627, 638 (Okl.Cr.1992). If voluntary intoxication is to be relied upon as an affirmative defense, the defendant must introduce sufficient evidence to raise a reasonable doubt as to his ability to form the requisite criminal intent. *Id.*

¶ 38 Here, Appellant initially denied any involvement in the case, but then admitted his involvement and tried to minimize it. He described in detail his activities immediately before, during and after the murder. He had the presence of mind to clean up after the murder and discard his bloody clothes. Witnesses who talked with Appellant shortly after the murder testified he was not under the influence of cocaine. Co-worker Chris Williams testified that when Appellant returned to the job site after having been gone for four hours he did not seem to be under the influence of cocaine. Sandra Moore, Appellant's girlfriend, testified that she saw Appellant and talked to him only a few hours after the murder and his demeanor seemed "normal." We find this evidence supports a finding that Appellant had the specific intent to kill the victim.

¶ 39 Although Appellant's evidence of a cocaine delirium conflicted with this evidence, it is within the exclusive province of the jury to resolve any conflicts in the evidence. *Yell v. State*, 694 P.2d 946, 948 (Okl.Cr.1985). This Court will not disturb the jury's verdict if it is supported by competent evidence. *Enoch v. State*, 495 P.2d 411, 412 (Okl.Cr.1972). Here, the jury apparently found Appellant was not so intoxicated and his mental abilities so overcome as to be unable to form the specific intent to kill. This finding is supported by sufficient competent evidence. Therefore, we find the evidence sufficient to support the conviction for first degree malice aforethought murder. This assignment of error is denied.

### B.

¶ 40 Appellant next challenges the sufficiency of the evidence to support his conviction for first degree burglary. Specifically, he argues the State failed to present sufficient evidence to establish the essential elements of "breaking" and "with a specific intent to commit some crime therein" pursuant to 21 O.S.1991, § 1431.

¶ 41 Section 1431(1), provides that the crime of First Degree Burglary is committed by:

Every person who breaks and enters the dwelling house of another, in which there is at the time some human being, with intent to commit some crime therein ... [b]y forcibly bursting or breaking the wall, or an outer door ...

¶ 42 The word "breaking" has been defined as "any act of physical force, however slight, by which obstructions to entering are removed." *Brecheen v. State*, 732 P.2d 889, 893 (Okl.Cr.1987), *cert. denied*, 485 U.S. 909, 108 S.Ct. 1085, 99 L.Ed.2d 244 (1988). Also encompassed in the statutory definition is constructive breaking which occurs when entry is obtained by any other manner, such as fraud, trick, or threats made while being armed with a dangerous weapon. *Id.* at 894. Whether a defendant intended to commit a crime in a house is determined by the intent of the individual at the time the unlawful entry was made. *Rowland v. State*, 817 P.2d 263, 265–66 (Okl.Cr.1991). Determination of intent is a question for the trier of fact and may be proven by direct or circumstantial evidence. *Id.* at 266.

¶ 43 In the present case, Appellant told police that he went to the victim's front door and asked for money. Not satisfied with the amount of money the victim brought to the door, Appellant pushed his way into the house and demanded to know where the rest of the money was. He grabbed the victim by the throat and dragged her through the house searching for valuables. As Appellant pushed his way through the door, a rug in the entry way was crumpled up and moved to the side. Investigating officers testified the entry way showed evidence of a scuffle. We find this evidence sufficient to show that Appellant forcibly broke into the victim's home with the intent to commit a crime therein.

¶ 44 In the alternative, Appellant argues that convictions for both malice murder and burglary with the intent to commit murder violate the principles of double jeopardy. This argument has previously been rejected in *Brecheen*, 732 P.2d at 899. We do so again. Accordingly, this assignment of error is denied.

### C.

¶ 45 Appellant argues in his ninth assignment of error the trial court improperly limited his cross-examination of certain witnesses. Initially, he contends the trial court improperly limited his cross-examination of the victim's husband by sustaining the State's objection to the question whether the prayer meetings at the Kauer's home included intercessory and spiritual warfare prayers. Appellant argues such testimony was relevant to his state of mind and his cocaine intoxication/delirium defense. Appellant has not explained, either at trial or on appeal, how the type of prayer meetings held at the victim's home had any relevance to his intoxication defense. Further, as Appellant never attended any of the prayer meetings, we fail to see the relevance of the defense inquiry. Therefore, we find no abuse of discretion in the trial court's ruling. See *Jackson v. City of Oklahoma City*, 678 P.2d 725, 726 (Okl.Cr. 1984) (the scope of cross-examination rests within the sound discretion of the trial court and only in cases of clear abuse of this discretion, resulting in manifest prejudice, will this Court reverse the trial court's decision).

¶ 46 Appellant next complains the trial court improperly restricted his cross-examination of Chris Williams and Detective Cook concerning his cocaine usage during the days and months prior to the murder. Appellant argued at trial and now on appeal that his long addiction to cocaine was relevant in determining his state of mind. The trial court disagreed, restricting examination into this area based upon its belief that Appellant's drug usage prior to the day of the murder was not relevant to the issue of whether he was intoxicated at the time of the murder. We agree with the trial court. Whether Appellant had used cocaine prior to the day of the murder has no relevance as to whether he was so intoxicated at the time of the murder to be unable to form the specific intent to kill. Appellant has failed to offer any support for his theory that he was addicted to cocaine and that addiction prevented him from forming the specific intent to kill. The trial court's restrictions on cross-

examination did not limit Appellant's presentation of his defense.

¶ 47 During first stage, the jury heard that on the day of the murder, Appellant asked Chris Williams whether he wanted to share a rock of cocaine and Williams' opinion that Appellant was gone from the job site for an extended period of time because he was using the cocaine. The jury also heard Appellant's opinion that the cocaine he took before the murder was "laced" with something that caused him to "hallucinate" and "flip out." During the second stage of trial, the jury heard Appellant's expert witness, Dr. Smith, testify that cocaine use can result in a cocaine delirium where the ordinary functions of the brain are so overwhelmed that the individual does not have much control over his or her behavior. Dr. Smith testified that the basis for his conclusion that Appellant was suffering from cocaine delusion was Appellant's total history including records and interviews from the past. It was not necessary for Appellant's prior drug usage to be specifically documented in order for his defense of voluntary intoxication to be presented to the jury.

¶ 48 Appellant also complains about the trial court's denial of his question to Sandra Moore regarding whether she falsely represented to Appellant that she was pregnant with twins. Appellant claims the evidence was relevant to Moore's credibility as to her opinion that Appellant appeared "normal" when she saw him shortly after the murder. The issue of whether Moore ever told Appellant she was pregnant with twins was collateral to any issue in this case. Moore merely testified to her perception of Appellant the day of the murder. If Appellant believed Moore was untruthful in her perception of him, he could have cross-examined her as to any existing bias on her part. Finding no error in the trial court's restriction of cross-examination, this assignment of error is denied.

### FIRST STAGE JURY INSTRUCTIONS

¶ 49 Appellant challenges the first stage jury instructions in his tenth assignment of error. The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court. Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Pham v. State*, 752 P.2d 830, 832 (Okl.Cr. 1988). With this rule of law in mind, we review Appellant's allegations. Initially, he objects to Instruction No. 29 arguing, as he did at trial, that it negates the instructions on voluntary intoxication and is confusing in combination with the other instructions on voluntary intoxication and murder. Instruction No. 29 provided:

> Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time.

(O.R.536). This language is verbatim 21 O.S. 1991, § 704. This instruction is an accurate statement of the rule of law that voluntary intoxication is not a complete defense to homicide, it merely reduces the crime to a lesser offense. See *Crawford*, 840 P.2d at 638. Contrary to Appellant's argument, we find no error in this instruction despite the fact it is not a uniform instruction. *Fontenot v. State*, 881 P.2d 69, 84 (Okl.Cr.1994) quoting *Palmer v. State*, 788 P.2d 404, 408 (Okl. Cr.1990), relied upon by Appellant, provides "when a jury must be instructed on a certain subject, the relevant uniform instruction shall be used unless the court determines 'that it does not accurately state the law'". 881 P.2d at 84. Instruction No. 29 was an additional instruction, it did not replace any uniform instruction. The jury was instructed extensively in this case on voluntary intoxication, malice aforethought murder, second degree murder and first degree manslaughter with all applicable uniform instructions given. This additional instruction did not confuse the jury and, considering the facts of this case, correctly advised the jury that a finding that the defendant was intoxicated did not absolve him of criminal responsibility. Accordingly, we find no error in Instruction No. 29.

¶ 50 Appellant also finds error in Instruction No. 30. This instruction is taken from 21 O.S.1991, § 702, which provides:

A design to effect death is inferred from the fact of killing, unless the circumstances raise a reasonable doubt whether such design existed.

(O.R.537). This type of instruction and whether it absolves the State from proving each and every element of the offense beyond a reasonable doubt has been previously discussed by this Court. *See Davis v. State,* 665 P.2d 1186, 1195 (Okl.Cr.1983); *Assadollah v. State,* 632 P.2d 1215, 1221 (Okl.Cr. 1981) (Brett, P.J. concurs in part/dissents in part). In *Hall v. State,* 635 P.2d 618, 620–21 (Okl.Cr.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982) this Court found no error in giving an instruction based on section 702 as the instructions as a whole fully informed the jury of the State's burden of proof on the question of the defendant's design to effect death. This Court further noted that the jury was also instructed that all elements of the offense must be proven beyond a reasonable doubt and that a premeditated design to effect death must be found in order to return a conviction for murder. In the present case, the jury was instructed on the elements of first degree murder, that each element must be proven by the State beyond a reasonable doubt, and that "malice aforethought" means "a deliberate intent to take away the life of a human being." The concerns raised in previous cases are not present here as the instructions clearly placed the burden of proof on the question of intent with the State, and not with the defense.

¶ 51 In the alternative, Appellant argues counsel was ineffective as no objection was made to the trial court's failure to instruct the jury under 12 O.S.1991, § 2304(C). That section provides:

Whenever the existence of a presumed fact against the accused establishes guilt or is an element of the offense or negatives a defense and is submitted to the jury, the judge shall give an instruction explaining that the jury may regard the basic facts as sufficient evidence of the presumed fact but is not required to do so. Where the presumed fact establishes guilt, is an element of the offense or a negatives a defense, the judge also shall instruct the jury

that its existence must be proved beyond a reasonable doubt. (Emphasis added.)

¶ 52 In *Wofford v. State,* 646 P.2d 1300, 1303 (Okl.Cr.1982) and *Hunter v. State,* 740 P.2d 1206, 1209 (Okl.Cr.1987), this Court stated that such a cautionary instruction is necessary when the instructions given to the jury create certain legal presumptions. In the present case, the instructions did not create such presumptions therefore, a cautionary instruction pursuant to section 2304(C) was not warranted. Counsel was not ineffective for failing to raise an objection. *See McKinnon v. State,* 752 P.2d 833, 835 (Okl.Cr.1988).

¶ 53 At trial, defense counsel objected to the heat of passion manslaughter instruction contending that it did not fit the facts of this case. He argued "heat of passion" was not involved in this case, rather it was a case of "dangerous weapon" manslaughter. Counsel said that to mention "heat of passion" and "provocation" in the instructions merely confused the jury and left them with no options other than guilt of first degree murder or acquittal. The same arguments are raised now on appeal.

¶ 54 Instructions Nos. 32–37 were uniform jury instructions on first degree manslaughter. (Oklahoma Uniform Jury Instructions–Criminal, 2nd ed.1997, 4–96—4–101.) These instructions are based upon 21 O.S.1991, § 711. First degree manslaughter may be committed in three different ways. 21 O.S.1991, § 711. Under Sub-section 2 first degree heat of passion manslaughter can be committed in either of two ways, i.e., in a cruel and unusual manner **or** by means of a dangerous weapon. In either case, "heat of passion" is an element of the offense of first degree manslaughter. *See Brown v. State,* 777 P.2d 1355, 1357 (Okl.Cr.1989) (heat of passion is required for first degree manslaughter by dangerous weapon). Therefore, we find no error in instructing the jury on the element of heat of passion.

¶ 55 In his final challenge to the first stage instructions, Appellant complains because the trial court failed to give his requested instruction on the defense of involuntary intoxication. He contends such an

instruction was warranted by his statement that the cocaine he ingested the day of the murder was, unbeknownst to him, laced with a hallucinogenic substance.

¶ 56 To invoke the defense of involuntary intoxication, the defendant must produce sufficient evidence to raise a reasonable doubt as to the voluntariness of his intoxication. *Wooldridge v. State,* 801 P.2d 729, 734 (Okl.Cr.1990). Involuntary intoxication results from fraud, trickery or duress of another, accident or mistake on defendant's part, pathological condition or ignorance as to effects of prescribed medication. *Id.* Appellant's unsupported claim of the presence of some hallucinogenic substance in the cocaine he voluntarily consumed was insufficient to warrant instructions on involuntary intoxication. Therefore, we find no error in the trial court's refusal of such instruction. The defendant is only entitled to an instruction on any theory of defense supported by the evidence, as long as that theory is tenable as a matter of law. *Kinsey v. State,* 798 P.2d 630, 633 (Okl.Cr.1990).

### ISSUES RELEVANT TO BOTH STAGES OF TRIAL

### A.

¶ 57 In his fifth assignment of error, Appellant contends the trial court erred in admitting highly prejudicial and inflammatory photographs during the first and second stages of trial. Over defense objections, the trial court admitted post-mortem photographs of the victim at the crime scene, photographs of the crime scene, and the medical examiner's report. Appellant argues that because of the gruesome nature of the photographs, the probative value of such photos was substantially outweighed by the danger of unfair prejudice.

¶ 58 The admissibility of photographs is a matter within the trial court's discretion and absent an abuse of that discretion, this Court will not reverse the trial court's ruling. *Williamson v. State,* 812 P.2d 384, 400–01 (Okl.Cr.1991), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1592, 118 L.Ed.2d 308 (1992). Photographs are admissible if their content is relevant and their probative value is not substantially outweighed by their prejudicial effect. *Smith v. State,* 737 P.2d 1206, 1210 (Okl.Cr.1987), *cert. denied,* 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1987); 12 O.S.1991, § 2403.

¶ 59 In the present case, the photographs showed the blood covered victim's body lying on the floor between the dining room and the kitchen area of her home. These photographs were relevant as they corroborated the medical examiner's testimony regarding the nature, extent and location of the victim's injuries. We reject Appellant's argument that such photos are not relevant if the cause of death and the location of the wounds are not contested. *See Hooks v. State,* 862 P.2d 1273, 1280–81 (Okl.Cr.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Williamson,* 812 P.2d at 400. In every criminal prosecution, it is the State's responsibility to prove, first, the corpus delicti, and second, that the crime was committed by the accused. Pictures of the murder victim are always probative in establishing the corpus delicti of the crime. *Williamson,* 812 P.2d at 400. Photographs of the extent of the victim's wounds are also relevant in the jury's determination of malice aforethought. *Hooks,* 862 P.2d at 1281. Admission of the photographs of the victim during the second stage of trial was relevant in proving the aggravating circumstance of "especially heinous, atrocious or cruel". The photographs of the crime scene were relevant as they corroborated the investigating officers' description of the scene.

¶ 60 The fact that the photographs may be gruesome does not of itself cause the photographs to be inadmissible. "Gruesome crimes result in gruesome pictures." *McCormick v. State,* 845 P.2d 896, 898 (Okl.Cr.1993). There is no requirement that the visual effects of a particular crime be down played by the State. *Id.* "The only consideration to be made is whether the pictures are unnecessarily hideous, such that the impact on the jury can be said to be unfair". *Id.* An experienced investigating officer testified in this case that the murder of Charlene Kauer was one of the most vicious

and violent murders he had ever seen. While the photographs of this murder were graphic, they "were not so repulsive as to be inadmissible." *Id.* quoting *Thomas v. State,* 811 P.2d 1337, 1345 (Okl.Cr.1991). Having reviewed the photographs in this case, we find them relevant and their probative value not substantially outweighed by any prejudicial impact. Therefore, the trial court did not abuse its discretion in their admission and this assignment of error is denied.

### B.

¶ 61 Appellant argues in his eighth assignment of error that inadmissible evidence introduced by the State during the first and second stages of trial denied him the right to a fair trial. Initially, he argues the trial court erred in admitting his pre-arrest and post-arrest statements, bloody clothing, fingerprints and body samples as his waivers of rights were not knowingly and voluntarily given. A pre-trial motion was filed to determine the admissibility of the evidence and a hearing was conducted. The trial court held the evidence admissible, finding that in each instance Appellant had knowingly and voluntarily waived his rights.

¶ 62 In determining whether a statement was made voluntarily, one must look to the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation. *Barnett v. State,* 853 P.2d 226, 230–231 (Okl.Cr.1993). "Where the voluntariness of a statement is in question it is proper procedure for the trial judge to hold an *in-camera* hearing to determine whether the statement was made voluntarily.... Where there has been such a hearing, this Court will not disturb the ruling where the trial court's decision to admit a statement is supported by sufficient evidence that the statement was made voluntarily." (citations omitted) *Id.,* at 231

¶ 63 Evidence presented at the in-camera hearing showed that Appellant was arrested on December 29, 1994, thirteen days after the murder. Prior to that time, he was interviewed by the police on December 23, 1994. Appellant was not considered a sus-

pect at that time, went to the police station voluntarily, and was free to leave when the interview was concluded. He voluntarily gave fingerprints and agreed to give body samples at a later date. No *Miranda* warnings were required and none were given. On the morning of December 29, 1994, Appellant voluntarily went to the police station again and agreed to give body samples. Appellant read and signed a waiver of rights to that effect. At both of these pre-arrest interviews Appellant did not appear to be under the influence of alcohol or drugs and no threats or promises were made in conjunction with either interview. The investigating officer described Appellant's demeanor as "normal" and said he was more intelligent than the people with whom he usually dealt. The officer stated Appellant seemed very willing to do what he could to help. Later in the day on the 29th the results of the fingerprint comparisons were received by police, and Appellant was subsequently arrested. Appellant was taken to the police station, read his *Miranda* warnings and signed a waiver indicating he understood those rights and that he agreed to talk with officers. Appellant initially was hesitant to talk with the officers without his minister present, so the interview was delayed until the minister could be present.

¶ 64 The following morning, December 30, 1994, Appellant contacted officers and volunteered to take the officers to the clothes he had worn during the murder. Appellant was informed of his *Miranda* rights and signed a waiver of those rights. Appellant voluntarily talked to the officers and showed them the location of the bloody clothes. At Appellant's request, the officers talked to him again on January 7, 9, and 13, 1995. At each interview, the *Miranda* rights were read and Appellant signed a waiver of those rights. At each of the post-arrest interviews, Appellant did not appear to be under the influence of alcohol or drugs, but was coherent and appeared to understand the officers and speak of his own free will. At no time did police coerce, threaten or make promises to Appellant. The interviews on December 29, January 7, 9 and 13 were taped and admitted into evidence. These

tapes show a very cooperative Appellant who responded to the officers' questions in an appropriate manner and who did not seem to be under the influence of alcohol or drugs. This record clearly shows Appellant's rights were protected and that each of his statements was given knowingly and voluntarily. We find no error in the admission of his statements, fingerprints or clothes.

¶ 65 Appellant next complains about a remark made by police chemist Susan Rose. While testifying to the obtaining of Appellant's blood samples, she stated that Appellant asked her how many other suspects there were and told her "I'm an ex-con". This comment drew an immediate objection from defense counsel and a request for a mistrial. After extended argument from both sides, in-camera, the trial court denied the motion for mistrial and offered to admonish the jury. Appellant initially objected to the admonishment, maintaining "once the bell has been rung its too late." However, the defense eventually agreed to a general admonishment to the jury to disregard the last statement of the witness. Such admonishment was then given to the jury.

¶ 66 Now on appeal, Appellant argues the remark was error which could not be cured by an admonition to the jury and therefore reversal is warranted. Appellant compares this case to *United States v. Sands*, 899 F.2d 912 (10th Cir.1990) wherein the Tenth Circuit found a cautionary instruction is not sufficient to cure any error where the error is likely to make a sufficiently strong impression on the jury that it will be unable to disregard it. In *Sands,* statements were made by two different witnesses concerning the defendant's past incarceration. Timely motions for mistrial were raised and overruled. The defendant rejected the court's offer of a cautionary instruction. The Tenth Circuit reversed the case and remanded for a new trial finding the weight of the evidence of the defendant's state of mind and his intent to kill was not overwhelming, that a jury in an earlier trial had not been able to agree on the issue of premeditation, and the second jury took five hours to reach its decision on the defendant's intent. The Court stated that such factors prevented it from

saying " 'with reasonable certainty that the reference to prior records had but a very slight effect on the verdict of the jury.' " 899 F.2d at 916, quoting *Sumrall v. United States,* 360 F.2d 311, 314 (10th Cir.1966). The Tenth Circuit also noted that defense counsel entered timely motions for mistrial, that the trial judge regarded the first comment as very important and initially stated he did not see how any error could be cured, and that the prosecutor's conduct, while not rising to the level of misconduct, certainly bordered on negligence.

¶ 67 While the present case is similar to *Sands* in the fact that timely defense objections were raised and the trial court realized the seriousness of the comment, there the similarities end. Here, the evidence of Appellant's intent to kill was great. His statements and conduct indicate a deliberate, specific intent to kill the victim. This was Appellant's first trial therefore we do not have the problem of a prior jury's disagreements. The sole comment was not intentionally elicited and the State was surprised by the answer received, although the prosecutor admitted she had not specifically admonished the witness about such a comment. Further, we reject Appellant's argument that the jury could not impartially consider his defense of voluntary intoxication after hearing the comment. The fact that Appellant may have had a previous conviction did not weaken his defense that he was so intoxicated at the time of the murder that he could not form the specific intent to kill.

¶ 68 In overruling the motion for a mistrial, the trial court relied on *Cheatham v. State,* 900 P.2d 414, 425 (Okl.Cr.1995). In *Cheatham,* this Court reiterated its long standing position that when inadmissible evidence or an improper comment is presented to a jury, an admonishment to the jury by the court that the evidence or comment is not to be considered will cure any error. Appellant tries to distinguish *Cheatham* in that defense counsel in that case did not request an admonition, unlike counsel in this case. That distinction does not render the principle of law enunciated in *Cheatham* inapplicable here. See *Al–Mosawi v. State,* 929 P.2d 270,

284 (Okl.Cr.1996), *cert. denied,* ——— U.S. ———, 118 S.Ct. 145, 139 L.Ed.2d 92 (1997) (a trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures· any error unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict). Here, the admonishment given to the jury was general in nature and did not emphasize the improper comment. The admonition was sufficient to cure any error as the comment about Appellant's prior conviction was not likely to make a sufficiently strong impression on the jury that it was unable to disregard it. Accordingly, this assignment of error is denied.

■■■ ¶ 69 Appellant next complains that technical investigator Charlene Reed improperly testified that the victim wore two rings which "were turned with the settings in as if she was trying to protect them or keep them from being seen." (Tr. VI, pg.266.) Defense counsel immediately objected asking how the witness could possibly have such knowledge. The trial court overruled the objection finding the testimony proper lay witness opinion. Now on appeal, Appellant argues the testimony was impermissible speculation, beyond the personal knowledge of the witness, lacking a proper foundation and its probative value was substantially outweighed by the danger of unfair prejudice.

■■■ ¶ 70 A lay witness may testify in the form of an opinion provided the testimony is based on her personal knowledge or perception and is helpful to the determination of a factual issue. *Wilkett v. State,* 753 P.2d 383, 387 (Okl.Cr.1988), 12 O.S.1991, § 2701. Lay witness testimony should only be rejected when not rationally based on the witness' perception. *Green v. State,* 713 P.2d 1032, 1038 (Okl.Cr.1985), *overruled on other grounds, Brewer v. State,* 718 P.2d 354, 365–66 n. 1 (Okl.Cr.1986).

■■■ ¶ 71 The comments were not based upon Ms. Reed's specialized knowledge and experience as a technical investigator for the police department, but were conclusions based upon her own perceptions after observing the victim's body at the medical examiner's office. Therefore, her opinion was that of a lay person not an expert. *See Farris v. State,* 670 P.2d 995, 997 (Okl.Cr.1983). The testimony was helpful in understanding issues in the case, i.e., whether Appellant actually forced his way into the victim's house or why the rings were not perceived as having value and were not taken. Appellant admitted pushing his way into the victim's house and dragging her through the house looking for valuables. It is not unreasonable to surmise that she might attempt to hide valuable stones on rings so that Appellant would not see them and take them. Further, the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice under 12 O.S.1991, § 2403 as it did not cause the jury to render its verdict based upon emotion or any other improper basis. Accordingly, we find no error in the admission of the testimony.

■■■ ¶ 72 Through the use of luminol, investigating officers discovered a shoe print in the victim's dining room. Although the print faded rapidly, officers attempted to photograph it. State's Exhibit 103 was a Polaroid photograph showing a portion of the bloody shoeprint. The officer who observed the print made a drawing of it to help preserve the image in his memory. This drawing was admitted as State's Exhibit 336. A print similar to the shoe print was admitted as State's Exhibit 51. Each of these exhibits was admitted over defense objection. Now, as at trial, Appellant challenges the relevancy of the exhibits.

■■■ ¶ 73 Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.1991, § 2401. In order to be relevant, the evidence need not conclusively, even directly, establish the defendant's guilt. Any legal evidence from which the jury may adduce the guilt or innocence of the defendant is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue. *Ashlock v. State,* 669 P.2d 308, 310 (Okl.Cr.1983). "Relevancy and materiality are matters within the sound discretion of the trial court absent

an abuse thereof". *Robedeaux v. State*, 866 P.2d 417, 432 (Okl.Cr.1993), *cert. denied*, 513 U.S. 833, 115 S.Ct. 110, 130 L.Ed.2d 57 (1994).

¶ 74 Although these exhibits were not identified as having belonged to Appellant or any other specific individual, they were relevant in showing the possibility of a person other than Appellant in the victim's home, a fact Appellant alluded to in one of his interviews. The exhibits were also relevant in showing the police conducted a thorough investigation and the prosecution was not hiding any evidence. Accordingly, we find no error in the admission of these exhibits.

¶ 75 Turning to the second stage of trial, Appellant finds error in the victim impact evidence in as much as no *in-camera* hearing was held to determine the admissibility of such evidence and as inadmissible hearsay was admitted in the form of a statement by the victim's son.

¶ 76 Prior to admitting victim impact evidence at trial, "the State should file a Notice of Intent to Produce Victim Impact Evidence, detailing the evidence sought to be introduced; and an *in-camera* hearing should be held by the Trial Court to determine the admissibility of the evidence as it relates to 12 O.S.1991, § 2403". *Cargle v. State*, 909 P.2d 806, 828 (Okl.Cr.1995), *cert. denied*, 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). "This victim impact evidence should not be admitted until the trial court determines evidence of one or more aggravating circumstances is already present in the record". *Id.* "The evidence sought to be introduced should be limited to the evidence listed in the prosecutor's notice filed before trial". *Id.*

¶ 77 Here, the State filed a Notice of Intent to Offer Evidence of Victim Impact Evidence stating that the victim's husband, daughter and son would each testify as to the effect the victim's death had on them emotionally, financially, and spiritually. Attached were copies of letters written by the victim's daughter and husband to the prosecutor concerning the above mentioned impact on their lives. Appellant's motion *in limine* concerning this evidence was overruled. At trial, an *in-camera* hearing was held wherein

the trial court specifically found the existence of one aggravating circumstance prior to admitting into evidence the victim impact testimony. That testimony was limited to the matters contained in the State's notice. Defense counsel raised no objections during that testimony.

¶ 78 Although no specific finding was made as to the admissibility of the victim impact evidence under 12 O.S.1991, § 2403, the record shows all parties were clearly aware of the nature of the testimony that would be presented, and the trial court's awareness of the potential for prejudice and danger of improper influence of the jury inherent in this testimony. Therefore, any error in the court's failure to make specific findings as to the admissibility of the victim impact evidence was harmless. *See Mitchell*, 884 P.2d at 1204–05.

¶ 79 Appellant additionally contends that a statement by the victim's son concerning another suspect in the case was inadmissible hearsay. David Kauer testified in part to his concern for his father staying in the house where his mother was murdered. The challenged comment was made as Mr. Kauer expressed his concern for his father "not only because ... he was going through a hard time but also because the police had told us that there was another suspect involved in the case that was still on the loose." Mr. Kauer then explained how he stayed with his father and commuted back and forth to work in Stillwater. The challenged comment was not inadmissible hearsay as it was not offered to prove the truth of the matter, i.e. that another suspect was on the loose. *Nunley v. State*, 660 P.2d 1052, 1055 (Okl.Cr.1983). 12 O.S.1991, § 2801(3). It was offered to show the reason for Mr. Kauer's concern for his father. Accordingly, Appellant's challenges to the victim impact evidence do not warrant relief.

¶ 80 Finally, Appellant asserts that second stage evidence concerning the robberies of three convenience stores was improperly admitted as the State failed to show adequate corroboration of Appellant's confession to those crimes. To be admissible, a defendant's confession must be sup-

ported by "substantial independent evidence which would tend to establish ... [its] trustworthiness ..." *Fontenot v. State*, 881 P.2d 69, 77–78 (Okl.Cr.1994), quoting *Opper v. United States*, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). "The independent evidence must support the essential facts sufficiently to justify the jury's inference of truth". *Rogers v. State*, 890 P.2d 959, 975 (Okl.Cr.), *cert. denied*, 516 U.S. 919, 116 S.Ct. 312, 133 L.Ed.2d 215 (1995). "Each material element need not be corroborated by facts independent of the confession and there may be inconsistencies between the facts proven and the facts related in the confession, unless the inconsistencies overwhelm the similarities". *Id.*

¶ 81 Appellant admitted to robbing three convenience stores in the Oklahoma City area prior to the murder of Charlene Kauer. He stated that at a store on N.W. 10th and May Avenue, he asked the clerk, a white man in his early twenties, for change then jumped over the counter brandishing a knife. John Holden, a clerk at the Texaco at the above location and a white man in his early twenties, gave the same account of a robbery on December 20, 1994. Appellant also told police he robbed a Save–A–Stop at N.W. 63rd. Appellant said he tapped on the window and the clerk, a black man, "buzzed" the door to let him in the store. Appellant said he asked the clerk for change, then jumped over the counter and took money from the register. Appellant admitted to being armed with a knife. Samuel Burge, a black man and a clerk at the above mentioned store, gave the same story of a robbery which occurred in December 1994. Appellant also admitted to robbing a Circle K store on Santa Fe in Edmond. Appellant said he asked a white female for change, jumped over the counter and stole money and cigarettes. Karen Phipps, a clerk at the above mentioned store, gave the same account of a robbery which occurred on December 14, 1994. Phipps testified that the robber had worn a red baseball cap. Appellant admitted to having a red baseball cap and said he may very well have been wearing that hat during the Circle–K robbery. Although none of the witnesses could identify Appellant as the man that committed the robberies, sufficient corrobo-

ration of the robberies was presented so as to properly admit the testimony of the three store clerks.

¶ 82 Based upon the foregoing, we find Appellant's complaints about the admission of certain evidence in both the first and second stages of trial are not sufficient to warrant relief. This assignment of error is denied.

## SECOND STAGE ISSUES

### A.

¶ 83 In his eleventh assignment of error, Appellant challenges the sufficiency of the evidence supporting the aggravating circumstances. "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed". *Romano v. State*, 847 P.2d at 387. "In making this determination, this Court should view the evidence in the light most favorable to the State". *Id.*

¶ 84 The jury found the existence of four aggravating circumstances: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was especially heinous, atrocious, or cruel; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 4) the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony.

¶ 85 In support of the "prior violent felony" aggravator, the State presented the testimony of Walter Simco, Appellant's probation and parole officer. Mr. Simco testified that Appellant had been transferred from a prison in California to a prison in Oklahoma and that at that time he was serving sentences for robbery and burglary convictions. Simco also stated that as a normal course of business, the Department of Corrections maintains a file concerning inmates and that he relied upon those records and discussed those records with Appellant during the supervisory period. Those records also reflected a conviction for assault with a deadly

**296**

weapon. Sybil Newcomb, custodian and supervisor of the Records Division of the Oklahoma County Sheriff's Office, testified that she compared Appellant's fingerprints to the those on the California convictions and they matched. This evidence of Appellant's prior assault with a deadly weapon conviction was sufficient to support the aggravator of "prior violent felony."

¶ 86 Appellant finds further error in the omission of a jury instruction informing the jury that the California robbery and burglary convictions were not to be used in support of the aggravator. Therefore, he argues it could not be determined from the record which one or more of the prior felony convictions the jury relied upon in finding the existence of the aggravator.

¶ 87 The jury was instructed that the California robbery and burglary could be used to enhance the punishment for the first degree burglary conviction. However, the jury was not specifically instructed that the "prior violent felony" aggravator was based upon the assault with a dangerous weapon conviction. Neither our state statutes nor case law require the trial court to instruct the jury on the specific evidence which can be used to support an aggravating circumstance. All that is required is that the terms used in the particular aggravating circumstances be adequately defined for the jury. Further, there is no requirement that the jury specify the evidence relied upon to support the finding of an aggravating circumstance. In this case it is sufficient that the jury was instructed that it must determine, beyond a reasonable doubt, that at the time of the murder, Appellant had been previously convicted of a felony involving the use or threat of violence to the person, and that evidence was introduced by the State to support such finding. We find no error in the omission of Appellant's requested instruction.

¶ 88 Appellant next challenges the evidence supporting the aggravating circumstance of "especially heinous, atrocious or cruel." Appellant asserts that as the order in which the injuries were inflicted could not be determined, there was no evidence of the victim's conscious physical suffering sufficient to support the aggravator.

¶ 89 Appellant's account of the murder, standing alone, is sufficient to support this aggravator. He stated that upon forcing his way into the victim's home, he grabbed her by the throat and dragged her to the bedroom. He made the victim undress, and although he said he did not touch her sexually, he stated that she "fought strongly." Appellant stated that while they were in the bedroom, he stabbed the victim in the chest and arms before dragging her into the kitchen. He stabbed her numerous more times with a variety of knives before plunging scissors into her chest. Detective Cook testified that general disarray of the victim's house and the blood splatters in the bedroom, down the hallway and in the dining room indicated a struggle had taken place.

¶ 90 The medical examiner, Dr. Chai Choi, testified to numerous stab wounds over the victim's body and a pair of scissors protruding from her chest. She also testified to numerous bruises, scratches and abrasions on the victim's lips, cheek, scalp and legs. Numerous cuts and scratches found on the victim's hands and arms were described as "defensive" wounds. Dr. Choi testified that none of the defensive wounds were life threatening and that the presence of those wounds indicated the victim was conscious during part of the attack.

¶ 91 "[E]vidence supporting a finding that the murder was especially heinous, atrocious or cruel requires proof that the death was preceded by torture or serious physical abuse". *Revilla v. State,* 877 P.2d 1143, 1155 (Okl.Cr.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995). Although the exact order in which the wounds were inflicted could not be determined by Dr. Choi, she did state the victim was alive when she received certain wounds, particularly the stab wounds to the throat and chest. She also stated that none of the wounds individually were fatal, but it was the totality of the wounds which caused the victim's death. This evidence, combined with the evidence of the defensive wounds and that of a struggle, clearly established the victim was conscious and aware of the attack. This evidence is sufficient to support a finding of torture and

serious physical abuse. *See Welch v. State*, 1998 OK CR 54, 968 P.2d 1231, 1247, 69 OBJ 3369, 3375–6; *Romano v. State*, 909 P.2d 92, 118–19 (Okl.Cr.1995); *Spears v. State*, 900 P.2d 431, 448–9 (Okl.Cr.1995), *cert.denied*, 516 U.S. 1031, 116 S.Ct. 678, 133 L.Ed.2d 527 (1995); *Hooker v. State*, 887 P.2d 1351, 1364–5 (Okl.Cr.1994), *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995).

¶ 92 Appellant next contends the evidence supporting the aggravator that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution is not sufficient. To support a finding of this aggravating circumstance the State must prove the defendant killed in order to avoid arrest or prosecution. *Carter v. State*, 879 P.2d 1234, 1250 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1172, 115 S.Ct. 1149, 130 L.Ed.2d 1107 (1995). The defendant's intent is critical. *Id.* However, as in other areas of criminal law, the defendant's intent can be proved by circumstantial evidence. *Snow v. State*, 876 P.2d 291, 299 (Okl.Cr. 1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). There must also be a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution. *Carter*, 879 P.2d at 1250.

. ¶ 93 In the instant case the evidence showed Appellant was well known to the victim and her husband. His forceful entry into the Kauer home and search for valuables would certainly have been reported to the police. Therefore, it is logical to conclude, and the evidence supports the finding, Appellant killed the victim to avoid arrest or prosecution for the burglary, which is a predicate crime, separate from the murder. This case is distinguishable from *Barnett v. State*, 853 P.2d 226, 233–4 (Okl.Cr.1993) relied upon Appellant. In *Barnett*, the defendant's initial assault and battery upon the victim was not separate and distinct from the murder itself, but due to the protracted nature of the assault it constituted a part of a continuing transaction which culminated in the death of the victim. This Court found that because the aggravated assault and battery, at a minimum, was a significant contributing cause of the victim's death, the defendant could not be found to have murdered the victim in order to avoid prosecution for the assault and battery. In the present case, the burglary was complete upon entry into the victim's home and was therefore separate and distinct from the murder. We find the evidence sufficient to support this aggravator.

¶ 94 Finally, Appellant challenges the evidence supporting the aggravator that the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony. Appellant argues this aggravator is not applicable as he was not serving a term of imprisonment under Oklahoma law but was instead on parole in Oklahoma on a California conviction. Appellant cites no authority for his argument, nor have we found any. Neither our state statutes nor case law limit the application of the aggravator to imprisonment on solely Oklahoma convictions. Therefore, we reject Appellant's request to so limit the aggravator in this case.

¶ 95 Appellant additionally argues the aggravator is invalid as duplicative and that it is limited to killings committed within a prison or correctional institution. This argument was rejected in *Duckett v. State*, 919 P.2d 7, 25–26 (Okl.Cr.1995). We do so again.

¶ 96 Appellant further challenges the constitutionality of the aggravators found in this case. Each of these aggravators has been found constitutional. *See Neill*, 896 P.2d at 554–5 (especially heinous, atrocious or cruel held constitutional), *Cannon v. State*, 904 P.2d 89, 106 (Okl.Cr.1995), *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996) (the murder was committed to avoid a lawful arrest or prosecution held constitutional); *Cleary v. State*, 942 P.2d 736, 746 (Okl.Cr.1997) (prior violent felony and while serving a sentence of imprisonment held constitutional). We decline Appellant's request to reconsider our position on these aggravators.

¶ 97 Appellant's last allegation in this assignment of error is that the trial judge's refusal to give his requested jury instruction on circumstantial evidence during the second stage violated his right to a reliable sentencing proceeding. An instruction

on circumstantial evidence was given during the first stage of trial. The court instructed the jury that all first stage instructions applied in the second stage, where appropriate. We find no error in omitting an additional circumstantial evidence instruction in second stage.

¶ 98 Having reviewed all of Appellant's challenges to the aggravating circumstances, we find modification of the sentence is not warranted. Accordingly, this assignment of error is denied.

### B.

¶ 99 In his twelfth assignment of error, Appellant raises several arguments which he acknowledges this Court has consistently rejected but states that he raises them again not only to preserve their review by subsequent courts but to give this Court an opportunity to reconsider the arguments. Initially, he argues that by instructing the jury that mitigating circumstances are those which in fairness and mercy may be considered as extenuating or reducing the degree of moral culpability or blame, the trial court allowed the jury to ignore mitigation evidence at its discretion. This argument has been rejected repeatedly by this Court, and we find no reason to revisit it. *Johnson v. State,* 928 P.2d 309, 317 (Okl.Cr.1996); *cert. denied,* —— U.S. ——, 118 S.Ct. 99, 139 L.Ed.2d 54 (1998); *Mayes v. State,* 887 P.2d at 1319–20; *Williamson v. State,* 812 P.2d at 409.

¶ 100 Appellant next contends the second stage instructions improperly instructed the jury to weigh the totality of aggravating circumstances against each individual mitigating factor, thereby diminishing the State's burden contrary to 21 O.S.1991, § 701.11. This argument has been rejected in *Allen,* 871 P.2d at 101. *See also Hamilton v. State,* 937 P.2d 1001, 1011 (Okl.Cr.1997). We have repeatedly held that we will not establish specific standards for the balancing of aggravating and mitigating circumstances. *Allen,* 871 P.2d at 101. In the instant case,

the instructions clearly state that an "aggravating circumstance or circumstances [must] out weigh (sic) the findings of one or more mitigating circumstances." Thus, the jury was adequately informed that aggravators must outweigh mitigating circumstances in order for the death penalty to be imposed.

¶ 101 Appellant next finds error in the trial court's failure to give his requested instructions defining "life without parole" and setting out the punishment options as death, life without the possibility of parole and life with the possibility of parole pursuant to *Johnson,* 928 P.2d at 320.[3] This Court has held there is no requirement for a trial judge to explain the Oklahoma parole process to a jury. *Mayes,* 887 P.2d at 1318. "[T]he concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further." *Id.* In *Johnson,* we stated that the plain language of the jury instruction setting forth the possible punishment options may be modified to provide greater clarity. 928 P.2d at 320. However, we specifically held such a modification in the instruction was not required. Here, the jury was adequately instructed as to the punishment of life without the possibility of parole.

¶ 102 Appellant next asks this Court to reconsider our position affirming the constitutionality of the Oklahoma death penalty scheme. See *Romano,* 847 P.2d at 392–393. We decline to do so.

¶ 103 Appellant argues the trial court erred in overruling his motion to strike Oklahoma's death penalty sentencing procedure as unconstitutional because it requires a jury to make special findings of fact. Appellant asks us to reconsider our position in *Duckett,* 919 P.2d at 27, rejecting this claim. We decline to do so.

¶ 104 Appellant's motion to present evidence that it costs more to execute someone was also overruled by the trial court. This Court has held that the specific issue of the cost effectiveness of the death penalty as opposed to other forms of punishment is not

---

3. Appellant's requested instruction, verbatim the instruction set forth in Johnson, provided:
Under the law of the State of Oklahoma, every person found guilty of murder in the first de-

gree shall be punished by death, or imprisonment for life without the possibility of parole, or imprisonment for life with the possibility of parole.

relevant to the sentencing concerns of the jury in a capital case. *Smallwood v. State,* 907 P.2d 217, 233 (Okl.Cr.1995), *cert. denied,* 519 U.S. 980, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996). We decline Appellant's offer to reconsider the issue.

¶ 105 Appellant next argues the jury should have been instructed on the presumption of life. This argument has been repeatedly rejected by this Court. *Duckett,* 919 P.2d at 22; *Johnson v. State,* 731 P.2d 993, 1003 (Okl.Cr.1987), *cert. denied,* 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987), *overruled on other grounds, Green v. State,* 862 P.2d 1271, 1272–73 (Okl.Cr.1993). We do so again.

¶ 106 In *Duckett,* we also rejected the appellant's request to personally address the jury during sentencing. We held there was no constitutional or statutory right for the defendant to make a plea for mercy, or otherwise address his sentencing jury, where he has elected counsel to make closing argument. 919 P.2d at 22. We will not consider this issue further.

¶ 107 Appellant finds error in the trial court's denial of his motion to quash the jury panel for allowing prospective jurors over seventy to be excused from jury service. This complaint has previously been rejected and we find no basis to depart from our previous decision. *Bryson,* 876 P.2d at 251.

¶ 108 Appellant next asks this Court to reconsider the constitutionality of victim impact evidence and its effect as a superaggravator. This claim was rejected in *Cargle,* 909 P.2d at 824–30. *See also Mollett v. State,* 939 P.2d 1, 12 (Okl.Cr.1997). Appellant has offered no convincing arguments as to why the issue should be reconsidered. Therefore, we decline to do so. We likewise decline Appellant's offer to reconsider our position that a separate jury need not be empaneled to decide punishment. *See McCracken v. State,* 887 P.2d 323, 331 (Okl.Cr.1994), *cert. denied,* 516 U.S. 859, 116 S.Ct. 166, 133 L.Ed.2d 108 (1995).

¶ 109 Appellant next asks this Court to reconsider its previous rulings that the standard instructions concerning the "especially heinous, atrocious or cruel" aggravator are

constitutional. *Duckett,* 919 P.2d at 24, *Romano,* 909 P.2d at 125. We decline to do so.

¶ 110 Finally, Appellant argues that the use of the same evidence to support more than one aggravator was error and "skewed" the weighing process. He further asserts that absent a limiting instruction, this had an impermissible spillover effect on the other aggravators. This Court has specifically approved the use of the same evidence in different manners to support more than one aggravator. *Paxton v. State,* 867 P.2d 1309, 1324–25 (Okl.Cr.1993), *cert. denied,* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994). We do so again. Further, Appellant argues the duplicative evidence was used to support the aggravator of "continuing threat". That aggravator was rejected by the jury. Therefore, we fail to find any reason to revisit the issue in this case.

¶ 111 Appellant provides no new or compelling reasons for this Court to alter its position on these issues, and we decline to do so. Proposition twelve is therefore denied.

## C.

¶ 112 In his fourteenth assignment of error, Appellant contends that his death sentence must be vacated as it is the result of passion, prejudice and other arbitrary factors. Initially, Appellant argues that relief is warranted due to errors raised in Propositions IV (exclusion of black jurors), Proposition V (prejudicial photographs), Proposition VIII ("ex-con" comment, "another suspect on the loose" comment, and unadjudicated acts), and Proposition XIII (prosecutorial misconduct). These issues have been previously discussed and no error warranting reversal or modification has been found.

¶ 113 Appellant next asserts the death sentence cannot stand because the evidence in mitigation outweighed the aggravating circumstances. Specific standards for balancing aggravating and mitigating circumstances are not required. *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Further, it is not this Court's duty to substitute its judgment for that of the jury. This Court is only statutorily mandated to perform a sentence review which requires

determining "whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the evidence supports the jury's ... finding of a statutory aggravating circumstance...." 21 O.S.1991, § 701.13(C).

¶ 114 In *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987) this Court rejected a claim similar to the one in the present case stating:

[This Court] will review such evidence only to the extent necessary to determine whether there was sufficient evidence from which a rational sentencer could find that the balance of aggravating and mitigating circumstances warranted a death sentence. We believe that this standard, which is analogous to the sufficiency of the evidence standard adopted by this Court in *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr. 1985), comports with the requirements of due process and adequately ensures that the death penalty is evenly enforced.

Applying this standard to the instant case, we find that there was sufficient evidence from which a rational sentencer could find that the aggravating circumstances outweighed the mitigating circumstances. Thus, this claim is denied.

¶ 115 Appellant further urges this Court to adopt the recommendation of the American Bar Association and impose a moratorium on executions. This state's death penalty statutes have repeatedly been upheld as constitutional. Appellant offers no authority that his execution would be violative of the constitution. We refuse to consider this issue further.

¶ 116 In his final claim in this proposition of error, Appellant asserts that the failure of this Court to ensure that the judge who presided over his trial prepare and file

the trial judge's report and the additional refusal of this Court to alter the briefing schedule in this case constitutes error mandating vacation of his death sentence. He argues that the trial judge's failure to prepare and file the statutorily mandated report violated his rights to due process.

¶ 117 Title 21 O.S.1991, § 701.13(A) provides that a report, in the form prescribed by this Court, prepared by the trial judge shall be sent to this Court together with all transcripts and records necessary for appeal. The trial judge's report in this case was filed on October 30, 1997, per this Court's order.[4] The judge who actually presided over Appellant's trial was no longer in office, therefore the report was filed by another district judge.[5]

¶ 118 Section 701.13(A) does not specifically set forth the purpose of the required report. Lacking a documented legislative history in this State, we have turned to other sources in an attempt to determine the Legislature's intent in requiring a trial judge's report. Our research has revealed that portions of Oklahoma's death penalty statute, passed by the Legislature in 1976, resemble the Georgia death penalty statute approved by the United States Supreme Court in 1976. *See Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Specifically, the mandatory sentence review included in the Oklahoma statute is similar to that in the Georgia statute. *See* Ga.Code Ann. § 17–10–35 and 21 O.S.1991, § 701.13(C).[6] In both statutes, the appellate court is directed to determine whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and whether the evidence supports the jury's finding of the statutory aggravating circumstances.

---

**4.** On September 29, 1997, Appellant filed with this Court a Notice of Absence of Trial Judge's Report in Capital Case. On October 20, 1997, this Court issued an Order Directing Presiding Judge to Cause Report of Capital Sentencing to be Prepared and Filed.

**5.** The trial judge's report was filed with the clerk of this Court October 28, 1997. Signed by the Honorable William Burkett, Judge of the District Court of Oklahoma County, it contained the following notation "[t]his report was submitted to

me by the Presiding Judge for Completion. It has been completed solely by trial counsel."

**6.** The statutes differ in their mandatory sentence reviews in that the Georgia statute provides for a three part mandatory sentence review, which includes a proportionality review, while the Oklahoma mandatory sentence review is only two parts and does not include a proportionality review.

¶ 119 The Georgia statute also includes a provision for a trial judge's report. The statute provides that a transcript and complete record of the trial, as well as a separate report by the trial judge, are to be transmitted to the appellate court for its use in reviewing the sentence. The statute further specifies the report is designed to elicit information about the defendant, the crime and the circumstances of the trial. It requires the trial judge to characterize the trial in several ways designed to test for arbitrariness and disproportionality of sentence. Included in the report are responses to detailed questions concerning the quality of the defendant's representation, whether in the trial court's judgment there was any doubt about the defendant's guilt or the appropriateness of the sentences, etc. The use of this report in the appellate court's mandatory sentencing review has been upheld by the Supreme Court of Georgia, *Greene v. State*, 240 Ga. 804, 242 S.E.2d 587 (1978) and the federal courts, *McCleskey v. Zant*, 580 F.Supp. 338, 402 (N.D.Ga.1984), *overruled on other grounds, McCleskey v. Kemp*, 753 F.2d 877 (11th Cir.1985).

¶ 120 Although this Court does not conduct a proportionality review as the Georgia Court apparently does, we find the Georgia statute instructive. The trial judge's report set forth in 21 O.S.1991 § 701.13(A) is solely for this Court's use during the Mandatory Sentence Review of a capital case. In conducting the statutorily mandated sentence review, this Court reviews the entire record on appeal to ensure the appropriateness of the death sentence and the sufficiency of the evidence supporting the aggravating circumstances. 21 O.S.1991, § 701.13(C). The trial judge's report has nothing to do with the actual trial or sentencing procedures, but provides the trial judge with the opportunity to make his or her impressions of the trial proceeding a part of the appeal record. It also provides the defendant with the opportunity to have certain non-record information brought before this Court. The failure of the trial judge to prepare and file such a report is a statutory violation. Such an error though does not impact the validity of the judgment rendered by the court and is subject to a harmless error analysis.

¶ 121 In the present case, a trial judge's report was prepared and filed. Appellant, through defense counsel, had the opportunity to include any information he deemed pertinent for this Court's review. Therefore, as Appellant was not denied an opportunity provided other capital defendants, his due process rights have been met.

¶ 122 In this case, the trial judge's report is not complete and does not contain the impressions of the judge who actually tried the case. The absence of such information however, has not prevented this Court from conducting a thorough mandatory sentence review (see below). The report received by this Court contained sufficient information, that when considered with the rest of the appellate record, enabled us to determine that the death sentence imposed in this case is factually substantiated and appropriate. Therefore, any error in the preparation and filing of this report was harmless.

¶ 123 In capital cases tried from the date of this opinion, the trial judge is hereby directed to personally prepare the trial judge's report mandated by section 701.13(A) and review it with the parties on the record at the time of formal sentencing in the case. The trial judge can either complete it on the record at time of sentencing or review the report that has been completed prior to the sentencing. A copy of the report is to be served on both the prosecution and the defense. Information and input may be received from both defense counsel and the prosecution. The report is then to be filed with the appeal record for submission to this Court.

¶ 124 Further, regarding the briefing schedule in this case, Appellant has failed to show any resulting prejudice from this Court's refusal to extend the briefing schedule in this case. A very thorough, well researched brief raising sixteen proposition of error was filed timely. Absent a specific showing of prejudice, Appellant's claim must fall, and none has been shown.

### PROSECUTORIAL MISCONDUCT

¶ 125 In his thirteenth assignment of error, Appellant contends that prosecutori-

al misconduct deprived him of a fair trial and reliable sentencing. Appellant cites to numerous instances during both stages of trial in which he contends the prosecutors exceeded the bounds of proper prosecutorial advocacy. He claims the prosecutors misstated the law on the presumption of innocence; improperly gave personal opinions as to guilt and as to Dr. Smith's testimony concerning Appellant's ability to form the specific intent to kill; elicited sympathy for the victim; improperly commented on the involvement of an unidentified third person in the murder; misstated the element of malice; attempted to dissuade the jurors from following the manslaughter instructions; improperly cross-examined Dr. Smith about malingering; gave a personal opinion as to the existence of the prior convictions and the aggravating circumstances; inflamed jurors by referring to wounds inflicted with steel-toed boots, pinking shears and a barbecue fork and Appellant's enjoyment of the victim's pain and suffering, and that only a death verdict could serve justice. Most of the comments complained of were not objected to at trial. Accordingly, as to these remarks, all but plain error has been waived. *Freeman v. State,* 876 P.2d 283, 287–88 (Okl.Cr.), *cert. denied,* 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994).

¶ 126 Our review of the record reveals that many of the comments not met with timely objection fell within the prosecutors' wide range of permissible argument. None were so egregious as to have risen to the level of reversible error. The record also reflects that of the few comments at issue to which objections were made, some of these objections were sustained. Where the trial court admonished the jury to disregard the improper statement the error was cured. *See Romano,* 909 P.2d at 116. Where no admonishment was given or requested, review, again, is limited to plain error. *Id.* In no instance where the allegations occurred did the comment rise to the level of plain error. "Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such to deprive the defendant of a fair trial." *Duckett,* 919 P.2d at 19. Because we do not find that the inappropriate comments deprived Appel-

lant of a fair trial or affected the jury's finding of guilt or assessment of the death penalty, we decline to grant relief on this proposition.

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 127 In his fifteenth assignment of error, Appellant contends he was denied the effective assistance of counsel. An analysis of the ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction . . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* at 688–89, 104 S.Ct. at 2065–66.

¶ 128 When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Id.* at 697, 104 S.Ct. at 2069. Concerning the prejudice prong, the Supreme Court, in interpreting *Strickland,* has held:

[an appellant] alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S., at 687, 104 S.Ct., at 2064; *see also Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986) ("The essence of an ineffective-

assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *Nix v. Whiteside,* 475 U.S. [157], at 175, 106 S.Ct. [988], at 998[, 89 L.Ed.2d 123 (1986)]. Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him. See [*United States v.*] *Cronic,* 466 U.S. [648], at 658, 104 S.Ct. [2039], at 2046[ 80 L.Ed.2d 657 (1984)]. *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993) (footnote omitted). Although we must consider the totality of the evidence which was before the factfinder, our "ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland,* at 695, 104 S.Ct. at 2069; *Fisher,* 736 P.2d at 1012.

¶ 129 Initially, he asserts that counsel's failure to object to the allegations of error raised in Propositions I—XIV warrants review for plain error and a finding of ineffective assistance of counsel. While failure to object may rise to the level of ineffective assistance of counsel, such a failure often will not be conclusive. Where objections that might have been raised would have been properly overruled and those that might have been sustained would have amounted to at most harmless error had the ruling been incorrect, Appellant has failed to show that any errors by counsel were so great as to render the results of the trial unreliable. *See McKinnon,* 752 P.2d at 835. As discussed herein none of the allegations raised by Appellant in Propositions I—XIV were sufficient to warrant reversal or modification, therefore any failure by counsel to object to such alleged errors did not render the result of Appellant's trial unreliable.

¶ 130 Appellant next argues that counsel's failure to request a continuance so that his psychiatrist, Dr. Smith, could have

time to perform a more thorough evaluation constituted ineffective assistance of counsel. A review of Dr. Smith's testimony shows that at no time did he indicate that he was unable to reach a conclusion as to Appellant's diagnosis because of time restrictions. Although he did testify that he "wished" he had more time to gather information from family members and that "perhaps if [sic] were more time had been available there were other things I might have done but I did not", no where does he state that he was unable to make a diagnosis of Appellant. Dr. Smith set forth the information upon which he relied in making his diagnosis (personal interviews with Appellant, Appellant's psychiatric records from California and Eastern State Hospital, and police interviews) and stated that he was able to make a very clear diagnosis of Appellant based upon the information he had reviewed. Dr. Smith explained in detail his diagnosis of cocaine delirium, providing a wealth of information on the condition itself and of Appellant's inability to form the specific intent to kill as a result of his being in a cocaine delirium, and his opinion that Appellant was a sociopath as he had an anti-social personality disorder. Dr. Smith never indicated that he needed more time to evaluate Appellant. Therefore, counsel was not ineffective for failing to request a continuance in order for Dr. Smith to evaluate Appellant further.

¶ 131 Appellant further finds counsel ineffective for failing to request a continuance so that further mitigation evidence could be completed. Specifically he finds error in counsel's failure to present evidence as to his military service and educational background or achievements.

¶ 132 In *Boltz v. State,* 806 P.2d 1117, 1126 (Okl.Cr.1991), we quoted *United States v. Glick,* 710 F.2d 639, 644 (10th.Cir.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 229 (1984):

"[A]n attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable...." An attorney's decision not to interview witnesses

and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.

¶ 133 Defense attorneys in this case called four second stage witnesses, Appellant's mother, father, brother and sister. They testified in part to the difficult time Appellant had after the death of his brother, Phillip. His mother and brother testified that Appellant dropped out of high school and joined the Job Corps after his brother's death. The fact that Appellant's trial attorneys did not present additional evidence of his education or evidence of his military service did not render their performance deficient. *Trice v. State*, 912 P.2d 349, 355 (Okl. Cr.1996). In fact, Appellant admits that he is unaware of what further investigation into these areas would reveal. Without some specifics regarding the evidence sought by Appellant, his claim is no more than a "fishing expedition" and is insufficient to warrant further investigation.

¶ 134 Further, Appellant has failed to show that, had the jury been informed of these additional mitigating facts, it would have concluded that those facts outweighed evidence in aggravation. *Id.* Therefore, we cannot find trial counsel ineffective for failing to seek a continuance for such speculative reasons.

¶ 135 Appellant also argues that trial counsel's concession during second stage closing argument that the aggravating circumstances outweighed the mitigating evidence cannot be justified as reasonable trial strategy. To the contrary, the record reflects a very valid strategy. Based upon the number of aggravators alleged against Appellant (five) and the supporting evidence of four of those aggravators, counsel's argument reflects a plea for mercy and a sentence of less than death. Counsel reminded jurors that according to their instructions, they were not required to impose the death penalty merely because they found the mitigating evidence to be outweighed by the aggravators. Under these circumstances, counsel's concession to the aggravators was neither unreasonable nor prejudicial. *Id.*

¶ 136 Filed with the direct appeal is an Application for Evidentiary Hearing on Sixth Amendment Claim and Motion to Supplement, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1998). Appellant asserts in the Application that counsel was ineffective in failing to request a continuance of the trial so that his psychiatrist, Dr. Smith, would have sufficient time to perform an adequate and reliable evaluation of Appellant's state of mind and sanity at the time of the offense and provide reliable testimony at trial. Appellant also asserts that trial counsel was ineffective for failing to request a continuance in order to investigate and develop mitigation evidence for presentation during the sentencing proceeding. Attached to the Application are two affidavits. In the first affidavit, Dr. J.R. Smith states he was retained by the Oklahoma County Public Defender's Office to conduct a psychiatric evaluation of Appellant. He sets forth certain shortcomings in his evaluation of Appellant, i.e. failure to review all video and audio taped police interviews of Appellant, failure to interview and obtain family history, confusion about the chronological sequence of Appellant's interviews with police. He states that in his opinion "further investigation and evaluation is needed to explore the probability that due to cocaine delirium and psychosis Mr. Patton was unable to distinguish right from wrong with respect to his actions and/or did not understand the nature and consequences of his actions at the time of the homicide." (Exhibit A).

¶ 137 In the second affidavit John Floyd, an investigator with the Oklahoma County Public Defender's Office, states he conducted the investigation into mitigation evidence in Appellant's case. Mr. Floyd states that due to his heavy caseload, he was unable to completely investigate and properly prepare for the punishment phase of trial. He further states that if he had had adequate time to prepare he would have gathered records from various sources regarding Appellant's birth, education, military service, employment and social security, in addition to his medical records and his mother's obstetric and prenatal care records. Mr. Floyd also lists people he would have interviewed given

sufficient time. These included family members, California Department of Corrections personnel, mental health personnel, military personnel and school teachers, counselors and coaches. Mr. Floyd also offered his opinion that Dr. Smith's ability to adequately assist in Appellant's defense was greatly inhibited by the time constraints of the district court. (Exhibit B). Appellant's Application contends these items constitute the "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demonstrate a strong possibility trial counsel was ineffective. Accordingly, Appellant urges this Court to so find and to order an evidentiary hearing to fully address the ineffectiveness issue.

¶ 138 Rule 3.11 allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial ..." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i).

¶ 139 The arguments raised in the Application for Evidentiary Hearing are the same arguments raised in the direct appeal concerning Dr. Smith's investigation and the presentation of additional mitigating evidence. While Appellant has provided a great deal of information in his supporting affidavits, he has failed to set forth sufficient evidence to warrant an evidentiary hearing. All of his claims are based upon requests for more time to develop and investigate additional mitigating evidence that he claims was available but not discovered by trial counsel. However, Appellant does not specify the evidence and facts that he claims were not discovered. The Application, filed over a year after the jury trial, states that "[b]ecause of time constraints and the lack of resources, appellate counsel has not been able to conduct a full investigation into matters outside the trial record as appears to be required by recent case law." (Application for Evidentiary Hearing, pg. 2). In effect, Appellant is seeking discovery to find out if there is any additional evidence available, rather than an evidentiary hearing to include in the record evidence that has already been discovered.

¶ 140 Appellant has failed to show that just because there is not a specific mention of certain evidence in the record that it was not discovered by counsel. If Appellant had said, in the Application, that he had discovered certain evidence but did not have sufficient time to analyze or develop that evidence, our answer to this question might be different. But as it is, his requests for more time to investigate fail to show by clear and convincing evidence a strong possibility that counsel was ineffective for failing to request a continuance of the trial. Further, the still speculative possibility the expert might have been able to identify an issue relating to Appellant's sanity was not raised until the direct appeal and this application for evidentiary hearing. The defense at trial was voluntary intoxication. On direct appeal, Appellant cannot, using the benefit of hindsight, assert that he was denied the right to present a defense that was not raised at trial.

¶ 141 Upon review of the application and the supporting affidavit, we find Appellant has not shown by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to request a continuance of the trial. *Darks v. State*, 954 P.2d 152, 168 (Okl.Cr.1998). Accordingly, we decline to grant Appellant's application for an evidentiary hearing.

### ACCUMULATION OF ERRORS CLAIM

¶ 142 In his sixteenth and final assignment of error, Appellant contends that, even if no individual error merits reversal, the cumulative effect of such errors warrants either reversal of his conviction or a modification of his sentence. We have reviewed Appellant's complaints and found any errors harmless beyond a reasonable doubt. Therefore, there can be no cumulative error. This assignment of error is denied.

## MANDATORY SENTENCE REVIEW

¶ 143 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of four (4) aggravating circumstances: 1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; 2) the murder was especially heinous, atrocious, or cruel; 3) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 4) the murder was committed by a person while serving a sentence of imprisonment on conviction of a felony. 21 O.S.1991, § 701.12(1)(4)(5)(6). As discussed previously, each of these aggravators was supported by sufficient evidence.

¶ 144 Turning to the mitigating evidence, Appellant presented four (4) witnesses, his mother, father, sister and brother. These witnesses testified that Appellant has a family that loves and cares for him; that he fully cooperated with the authorities after his involvement in the crime; that he has a mental disorder and this mental disorder caused him to be previously committed to a mental hospital; that he has abused crack cocaine and his mental, psychological development has been permanently damaged thereby; that he was under the influence of crack cocaine at the time of the homicide and was in a state of psychotic delusion induced by crack cocaine; that he was then and is now unable to remember all the circumstances surrounding the victim's death due to his degree of intoxication at the time; that twenty-three months after his arrest, Appellant is sober and drug free; that while incarcerated, Appellant has not been a threat to anyone in the prison system; that Appellant is a brick mason by trade and can readily utilize that trade in a closed prison environment which will benefit and contribute to society; that Appellant's brother, Phillip, was deliberately electrocuted and Appellant has suffered sever emotional disturbance ever since that time; and that Appellant has strong feelings of sorrow, remorse and sadness that he was involved in the taking of the victim's life. This evidence was summarized into fourteen (14) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating.

¶ 145 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate as to Count I, first degree murder. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.1991, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENT** and **SENTENCES** for First Degree Murder and First Degree Burglary are **AFFIRMED** and the **APPLICATION FOR EVIDENTIARY HEARING ON SIXTH AMENDMENT CLAIMS IS DENIED.**

CHAPEL, P.J., and STRUBHAR, V.P.J. Concur in Result.

LANE, J., and JOHNSON, J., concur.

